UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RANDAL C. STAHLEY,          ) | |
|     Plaintiff/Counter-Defendant,   ) | |
|                                   ) | |
| vs.                         ) | 1:06-cv-1046-LJM-WTL |
|                                   ) | |
| PEPPERIDGE FARM, INCORPORATED, ) | |
|     Defendant/Counter-Plaintiff.  ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This cause is now before the Court on defendant/counter-plaintiff's, Pepperidge Farm, Inc. ("Pepperidge Farm"), Motion for Summary Judgment on the claims brought against it by plaintiff, Randal C. Stahley ("Stahley"), and on its own counterclaims against Stahley. Stahley opposes Pepperidge Farm's motion asserting that there is a material question of fact on all the issues in this case.

For the reasons stated herein, the Court **DENIES** Pepperidge Farm's Motion for Summary Judgment.

### I. BACKGROUND

#### A. THE RELATIONSHIP BETWEEN THE PARTIES

On March 22, 1999, Stahley and Pepperidge Farm entered into a Consignment Agreement that gave Stahley the exclusive right to distribute Pepperidge Farm consigned products to retail stores within a prescribed territory, subject to the conditions set forth in paragraphs 1, 6, 7, and 9, of the Consignment Agreement. *See* Consignment Agreement. Pursuant to the terms of the Consignment Agreement, Stahley received a 20% commission for consigned products sold and delivered to retail

stores within Stahley's territory. *Id.*; Corneck Aff. ¶ 5. In order to determine the amount of commissions Stahley was entitled to receive, Stahley was required to report the amount of consigned products sold and delivered to retail stores by submitting weekly sales tickets to Pepperidge Farm. Corneck Aff. ¶ 6. Upon receipt of the sales tickets, Pepperidge Farm would pay Stahley his commission on the net sales as reported thereon. *Id.* ¶ 7. Pepperidge Farm sent a weekly Settlement Statement to Stahley that reflected the amount of commission payable to him. *Id.* ¶ 8.

In addition to the sales and commissions owed Stahley as a result of those sales, each Settlement Statement also provided a separate detailed accounting of the amount of inventory consigned product Stahley had delivered to retail stores, the amount of consigned product Pepperidge Farm had shipped to Stahley, and the current amount of consigned product Stahley had in his inventory. *Id.* ¶ 10. According to Pepperidge Farm, Stahley was required to report to Pepperidge Farm on a weekly basis the amount of inventory he had of each consigned product. *Id.* ¶ 11. The accuracy of this inventory report is depends upon the accuracy of the information submitted by Stahley. *Id.*

Distributors, like Stahley, are contractually obligated to keep certain records and to report transactions accurately to Pepperidge Farm. *Id.* After receiving a Distributor's weekly inventory report, Pepperidge Farm compares the Distributor's amount of claimed inventory against the amount of inventory that Pepperidge Farm's records show that the Distributor should have in his or her possession. *Id.* ¶ 12. If the Distributor's inventory records do not match Pepperidge Farm's records, Pepperidge Farm will adjust the inventory amounts in its system to coincide with the Distributor's inventory reports. *Id.* ¶ 13. If the amount of consigned product reported by a Distributor is lower than that Pepperidge Farm believes the Distributor should have, Pepperidge Farm will charge the

Distributor for the value of the missing units of consigned product. *Id.* This charge is reflected on each Settlement Statement as an inventory adjustment and is debited as a cash charge against the Distributor by Pepperidge Farm. *Id.* In effect, if a Distributor loses or cannot account for consigned inventory, he is charged for that inventory. *Id.*

Conversely, if the amount of consigned product a Distributor reports in inventory exceeds the amount that Pepperidge Farm records indicate he or she should have, Pepperidge Farm will credit the Distributor for the value of the additional units of Product, and will make a corresponding cash payment for the additional inventory as part of the weekly settlement process. *Id.* ¶ 14. This addition "payment" for excess inventory is not a commission; rather, it is a method for periodically reconciling the Distributor's inventory of consigned products during the relationship, subject to a final physical reconciliation at the end of the relationship. *Id.*

On January 10, 2005, Stahley sold his distributorship. *Id.* ¶ 16. Prior to the sale of the distributorship, Pepperidge Farm, through an inventory reconciliation process, determined that Stahley, over the prior fiscal year, in addition to receiving commissions on all reported sales, had received additional cash payments of $52,216.30 from Pepperidge Farm for excess inventory for which Stahley could not account. *Id.* Pepperidge Farm asserts that this created a "negative balance" in Stahley's account with it and Pepperidge Farm withheld $52,216.30 from the sale proceeds of Stahley's distributorship pursuant to the Consignment Agreement paragraph 16. Corneck Aff. ¶ 17; Consignment Agreement ¶ 16. Pepperidge Farm then asked Stahley for an accounting or other explanation for the excess inventory. Corneck Aff. ¶ 17. Stahley repeatedly professed to have no idea how the discrepancy arose. *Id.*

During his deposition, however, Stahley testified that he had purchased, for cash, product from fellow Pepperidge Farm distributors, "under the table," without informing Pepperidge Farm. Stahley Dep. at 89-91; 98-99; 107-09; 126-30. According to Stahley, after he purchased this product from the other distributors, he manually added it to his own inventory via his hand-held computer, which caused an inventory overage. *Id.* This inventory overage resulted in a favorable inventory adjustment in the form of a payment to him by Pepperidge Farm. *Id.* Stahley admitted that he was unable to provide any documentation to substantiate that he had made such purchases or their amount. *Id.* at 90-91; 98-99; 106. Stahley testified that the reason that he did not provide this explanation to Pepperidge Farm earlier, despite being asked repeatedly, was that he was concerned that Pepperidge Farm would "take my distributorship and tell me to leave." *Id.* at 127.

### B. THE CONSIGNMENT AGREEMENT

The asserted portions of the Consignment Agreement read as follows:

> 1. EXCLUSIVENESS OF DISTRIBUTORSHIP. Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3 (b); provided, however, that Bakery will have the exclusive right to distribute Consignee Products to retail facilities owned or operated by Bakery or by any corporation controlled by Bakery. The terms of this Paragraph are subject, however, to the terms of Paragraphs 6, 7, and 9.

> \* \* \*

> 3. PROCEEDS AND RECORDS OF SALE.

> \* \* \*

(b) . . . For the performance of his/her services of solicitation and delivery under this subparagraph (b), Consignee, if he/she shall have made prompt and timely delivery of all charge tickets as required by subparagraph (d) (2), shall be paid a percentage of net proceeds payable to Bakery by the direct billing customers, such percentage to be calculated at the rate specified in Schedule B.

\* \* \*

(e) Consignee will keep such records of Consigned Products received and sales and deliveries made as Bakery may from time to time reasonably request; Bakery may inspect such records and Consigned Products at such time as Bakery may select. Without limiting the generality of the foregoing, Consignee agrees that Bakery may take physical inventory of Consigned Products in Consignee's possession whenever and as often as Bakery deems advisable and that Consignee will keep such records of his/her operation and will furnish Bakery such copies thereof as Bakery may reasonably require.

\* \* \*

6. EMERGENCY SERVICE. If, by reason of illness or vacation or any other cause, Consignee shall be unable at any time tot provide or maintain the efficient distribution service contemplated by this Agreement, Consignee will make other suitable arrangements at his/her own expense for the provision and/or maintenance of such service; but if Consignee is unable to do so, Bakery is authorized at its discretion to provide and/or maintain such service as Consignee's agent and at consignee's expense and risk. Upon the request of Consignee, Bakery will endeavor in any emergency to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.

7. FAILURE TO SERVICE PARTICULAR STORES. If Consignee fails for any reason to provide or maintain satisfactory distribution service to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the

\* \* \*

9. PROHIBITED SALES AND DELIVERIES. Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing. Also, Consignee will not, without like authorization, make deliveries of Consigned Products to any chain via a central or district warehouse or in any manner other than directly to its retail stores. If, despite the best efforts of Consignee and Baker to obtain permission

from any chain to make deliveries directly to its retail stores, such chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion to sell and deliver Consigned Products directly to such chain for its own account via warehouse deliveries as long as such refusal remains in effect.  In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period of time set forth in such written request, distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

\* \* \*

    16. LIEN OF BAKERY ON DISTRIBUTORSHIP.  Bakery shall have a first lien on this Distributorship and all proceeds of this Distributorship as security for all indebtedness of Consignee to Bakery at any time outstanding.  Any sale, transfer or assignment of this Distributorship (invalid per Paragraph 18 without the written approval of Bakery) shall be subject to such lien unless such lien shall be expressly released by Bakery in writing.  Consignee shall not, without the prior written consent of Bakery, encumber or grant any security interest in or lien upon, or by his/her action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon this Distributorship, other than the lien imposed by this Paragraph 16; and it is expressly agreed that Bakery shall have no obligation whatsoever to consent to any such encumbrance, security interest or lien unless and until the proposed lienholder shall have agreed in writing to subordinate its lien, encumbrance or security interest to the lien created by this Paragraph 16.  Bakery's consent to any such encumbrance, security interest or lien which has been so subordinated to the lien of Bakery established pursuant to this Paragraph 16 shall not be unreasonably withheld.

\* \* \*

    18. SALE OF DISTRIBUTORSHIP.  This Distributorship may not be sold, conveyed or transferred by Consignee in whole or in part without the prior written approval of Bakery.  Bakery will grant such approval with respect to a proposed sale if (I) Consignee has given Bakery proper and timely notice of such proposed sale as required by Paragraph 17, (ii) Bakery has not exercised, or has in writing refused to exercise, its Right of First Refusal with respect to such proposed sale and (iii) the purchaser meets the requirements of Bakery as to character, ability, financial responsibility, business acumen and adequate facilities; provided, however, that any such approval shall be conditioned upon Consignee's payment in full, prior to such sale, of all Consignee's indebtedness to Bakery. . . .  Any valid sale of this Distributorship as a whole shall operate to release Consignee from all obligations to Bakery hereunder except the obligation to pay in full any adverse balance in his/her account with Bakery, and Bakery shall have the right in its discretion to require the purchaser to accept a new consignment agreement in substantially the same form, in lieu of continuing this Agreement in effect, in whole or in part, on an assigned basis.

\* \* \*

21. TERMINATION OF CONSIGNMENT AGREEMENT BY CONSIGNEE. Consignee shall have the right in his/her discretion to terminate this Agreement at any time upon thirty days written notice to Bakery.  Termination pursuant to this Paragraph shall operate to release all rights and obligations thereunder of both Bakery and Consignee except the right to receive any favorable balances and the obligation to pay any adverse balances.

\* \* \*

23. TERMINATION OF CONSIGNMENT AGREEMENT WITHOUT CAUSE. Bakery shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the Consignee. . . .   Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (I) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the rights and obligations with respect to payment and arbitration stated in this Paragraph.  This Paragraph, and the rights and remedies set forth in this Paragraph, shall constitute the Consignee's sole remedy in the event of termination of this Agreement without cause.

Consignment Agreement, ¶¶ 1, 3(b), 3(e), 6, 7, 9, 16, 18, 21, 23.

### C.  THE CLAIMS IN THIS LAWSUIT

As stated above, Pepperidge Farm withheld $52,216.30 from the proceeds of the sale of Stahley's distributorship to recover on the "balance" in his account created by excess inventory for which Stahley has been unable to account.  Stahley initiated this lawsuit to recover that amount, which Stahley contends was wrongfully withheld by Pepperidge Farm under the terms of the Consignment Agreement.  Stahley also asserts that Pepperidge Farm unlawfully converted the $52,216.30 by wrongfully withholding the inventory reconciliation adjustments after the sale of his distributorship when such amounts were clearly due and owing to him under the Consignment Agreement.

In turn, after it discovered that Stahley had received excess cash payments for excess inventory for which he could not account, Pepperidge Farm reviewed Stahley's inventory adjustments and

Settlement Statements from September 2001 through August 2003. Corneck Aff. ¶ 18. This further look back disclosed that during those earlier periods, Stahley received an additional $71,949.04 in cash for alleged inventory in excess of the amounts that were reflected in the records of Pepperidge Farm. *Id.* ¶ 19. Pepperidge Farm seeks to recoup this amount either under a breach of contract theory or under an unjust enrichment theory.

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. DISCUSSION

The crux of Pepperidge Farm's argument is that pursuant to its policy of reconciling inventory, which is not set forth in the Consignment Agreement, at the time it approved the sale of

9

Stahley's distributorship Stahley had an indebtedness to Pepperidge Farm, which under paragraph 16 of the Consignment Agreement created a lien on certain proceeds of the sale. But no where in the Consignment Agreement is it set forth that an inventory discrepancy that Pepperidge Farm failed to discover over the course of doing business with Stahley for over five years leads to an indebtedness. Rather, the Consignment Agreement only references "adverse balances" as being due to Pepperidge Farm at the sale of the distributorship. The actual inventory adjustment statements showed that Pepperidge Farm owed Stahley exactly what Pepperidge Farm had in fact paid Stahley because those balances were in favor of Stahley. That Stahley cannot in the final analysis account for that inventory and has admitted that he obtained it through other distributors rather than directly from Pepperidge Farm does not make the amounts Pepperidge Farm paid Stahley an indebtedness. The Consignment Agreement required Stahley to keep reasonable records of his business. Consignment Agreement, ¶ 3(e). But, there is no provision in the Consignment Agreement that creates an indebtedness for the failure to do so. Rather, it seems that the proper remedy for the failure to perform this contractual obligation was a breach of contract action. Pepperidge Farm's solution is in the nature of self-help whereby it created an indebtedness where the records required between the parties appear to show no adverse balance in Pepperidge Farm's favor. At the very least there is a question of fact on exactly what the records of Stahley's business and Pepperidge Farm's inventory system showed at the time of the distributorship sale.

     Under the written terms of the Consignment Agreement, the Court cannot agree with Pepperidge Farm that summary judgment in its favor on Stahley's claims is appropriate. By withholding funds under the lien provision without a clear-cut contractual right to do so, a reasonable

jury could conclude that Pepperidge Farm breached the Consignment Agreement, wrongfully withheld money that did not belong to it or was unjustly enriched.

With respect to Pepperidge Farm's counterclaim, there is a material question of fact on whether the evidence shows that Stahley breached the Consignment Agreement and on whether Pepperidge Farm waived its right to assert a claim under the contract by approving the sale of Stahley's distributorship. In addition, there is a material question of fact on whether, having approved the sale of the distributorship and perhaps having waived a claim under the contract, Pepperidge Farm may now assert a claim for unjust enrichment.

### IV. CONCLUSION

For the reasons stated herein, the Court **DENIES** defendant's, Pepperidge Farm, Inc., Motion for Summary Judgment.

IT IS SO ORDERED this 28th day of April, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Jarrell B. Hammond
LEWIS WAGNER
jhammond@lewiswagner.com

Jason R. Delk
ICE MILLER LLP
jason.delk@icemiller.com

Brett Y. Hoy
LEWIS WAGNER LLP
bhoy@lewiswagner.com

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com